# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ELOUISE RUE ORTEGA,

        Plaintiff,

v.                                      No. CIV 10-1101 JP/LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on Plaintiff Elouise Rue Ortega's ("Ortega") Motion

to Reverse or Remand Administrative Agency Decision, filed June 28, 2011.  [Doc. 15.]  The

Commissioner of Social Security issued a final decision denying benefits, finding that Ortega was

not entitled to disability insurance benefits ("DIB") or supplemental security income ("SSI").  The

Commissioner filed a response to Ortega's Motion [Doc. 16], and Ortega filed a reply [Doc. 17].

Having considered the pleadings submitted by the parties, the administrative record and the

applicable law, the Court recommends that the motion to remand be granted for the reasons stated

below.

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and
recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such
findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court
within the fourteen-day period allowed if that party wants to have appellate review of the findings and
recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v.
Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that
a party who fails to object to magistrate judge's findings and recommendations in timely manner waives
appellate review of both factual and legal questions).

I.      **PROCEDURAL RECORD**

On about June 17, 2008, Ortega applied for DIB and SSI [AR 128, 135], initially alleging she was disabled since July 1, 2000, based on an injury to her lower back while lifting furniture at work.  [AR 26, 263.] At the ALJ hearing in December 2009, counsel for Ortega amended the disability onset date from July 1, 2000 to September 1, 2007, because Ortega continued to work until at least late 2007.  [AR 25.]

Ortega's DIB and SSI applications were denied at the initial and reconsideration levels. [AR 65-69, 73, 85-90.]  On December 3, 2009, the ALJ conducted an administrative hearing in Roswell, New Mexico, at which Ortega appeared and was represented by counsel.  [AR 22-63.]  On March 25, 2010, the ALJ issued a decision finding Ortega was not disabled and denying her benefit applications.  [AR 7-18.] On May 27, 2010, Ortega filed a request for review, and submitted an attorney's letter in support of her request. [AR 6, 193.] On September 16, 2010, the Appeals Council denied her request for review. [AR 1-3.]  On November 18, 2010, Ortega filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Ortega was born on January 9, 1957, and was 52 years old at the time of the ALJ hearing. [AR 53, 54.]  Ortega has an associate of arts degree or a two-year college degree. [AR 48, 264.] She was married for 20 years but now is divorced and lives in a home in Roswell with one or two daughters. [AR 129, 165.]

In July 2000, when Ortega injured her back at work, she was working for Roswell Job Corps Center, cleaning rooms and moving furniture. [AR 26.] For some reason, her disability paperwork [AR 144, 150] does not list this work, but it appears from testimony at the ALJ hearing that Ortega

continued to work full time up until September 2007.[2] [AR 30.]  Her job information states that she worked full-time as a teacher's aide in a school district from 1999-2000, but during the hearing, Ortega testified this was part-time work as a substitute teacher. [AR 24-25, 144.] The job information form also indicates Ortega's next position was as a full-time community home care provider at an elderly care facility from January 2005 to April 2008. [AR 144.] However, it appears that Ortega continued to work at Roswell Job Corps Center after her injury to some later date, perhaps into 2004. [*See* release to work, dated April 20, 2001, AR 265; return to work, dated Sept. 2, 2003, AR 247.]

At the December 2009 ALJ hearing, Ortega testified that she worked full-time for Espinoza Developmental Services doing home health care until the end of August 2007.  [AR 27.] She then testified that she held several part-time jobs for both Hobby Lobby and Denios Cleaners.  [AR 28.] Ortega's job information form indicates she worked two short-term, full-time jobs from April 2007 to August 2007 as a recreational helper, and from May 2007 to August 2007 as a direct care employee at a disability care facility.  These two full-time positions appear to overlap for a period of months and may reflect some type of typographical error. [AR 144.] From August 2007 to September 2007, Ortega worked full time as a cashier at a "craft store," presumably Hobby Lobby. [AR 144.] From November 2007 to January 2008, Ortega worked part time as a server at a restaurant. [AR 144.] From March 2008 to April 2008, she worked part time at a dry cleaners. [AR 144.] The ALJ concluded that all work Ortega performed after September 1, 2007, the amended onset date, was below substantial gainful activity. [AR 12.]

---

[2]There are no earnings records that were made part of the Administrative Record. [AR 27.]

## II.  STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

4

claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10]

Here, after relying on the grids as a framework and on testimony of a vocational expert, the ALJ determined at step five of the sequential evaluation that Ortega could perform light work, with restrictions. [AR 16-18.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the

---

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

The ALJ denied Ortega's request for DIB and SSI. [AR 10-18.]  The ALJ determined Ortega had not been engaged in substantial gainful activity since September 1, 2007, the amended onset date, and further that she had severe impairments consisting of disorders of the lumbar spine with radiculopathy. [AR 12.]  The ALJ found that Ortega's Type II Diabetes Mellitus ("DM") was well controlled by oral medications and diet modifications and thus, was not a severe impairment. [AR 14.]  The ALJ further determined that none of Ortega's impairments or combination of impairments met listing criteria.  [AR 14.]  The ALJ concluded that Ortega had the residual functional capacity ("RFC") to perform light work, but that she could not climb ladders, ropes or scaffolds, and could only engage in occasional stooping or crouching.  She also could not work in a fast-paced production environment; she could pay attention and concentrate for two hours at a time but then needed a break.  The ALJ also provided limitations as to the way she could twist, based on a specialist's treatment note. [AR 14-15.]

The ALJ also found that Ortega's subjective complaints and alleged limitations were not credible to the extent they were inconsistent with the above-described RFC.  [AR 16.]  The ALJ decided that Ortega's RFC prevented her from performing her past relevant work as a health care provider for the elderly because that type of work was "medium," rather than "light." [AR 16.] However, the ALJ found that Ortega's RFC did not prevent her from performing jobs that existed in the economy, including office helper, mail clerk, and recreation attendant. [AR 17.]  In so finding, the ALJ relied in part of the vocational expert's testimony that was consistent with information contained in the Dictionary of Occupational Titles and on the grids as a framework. [AR 17.]

IV.    **MEDICAL HISTORY AND BACKGROUND**

### *2000 Records*

Ortega worked from 1999 to 2000 as a substitute teacher. [AR 144.]  In July 2000, while working for Roswell Job Corps Center and lifting furniture, Ortega suffered an injury to her lower back. [AR 26.] Ortega continued to work after her injury. [AR 30.]

### *2001 Records*

From 2001 through part of 2009, Ortega was seen at the Industrial Rehabilitation Clinics ("IRC") by several different medical providers.  On April 20, 2001, Ortega was seen at IRC for a complete evaluation and consultation regarding her July 2000 injury.  Her treatment to date had been conservative.  Ortega had a course of physical therapy and was treated with medications but still suffered from pain.  She continued to work with back pain that was "fairly sharp and constant."  She felt pain when lifting and standing. [AR 263.]

7

On May 10, 2001, Ortega had a lumbar spine MRI that indicated "first degree spondylolisthesis[11] of L5 on S1. There was also a mild disc protrusion at L5-S1. No spinal stenosis was evident. [AR 276, 333.] On June 1, 2001, Ortega was seen by Dr. Reeves at IRC. He scheduled her for an EMG and nerve conduction study. Dr. Reeves noted that he did not believe a first degree spondylolisthesis was reason for surgery. [AR 261.] The EMG and nerve conduction study revealed "irritability in L4-L5 distribution, most likely L5 radiculopathy."[12] [AR 260.] Dr. Reeves excused Ortega from work for one week because of her complaints of increasing pain and the plan to schedule her for epidurals in the next two weeks. [AR 260.]

There are physical therapy notes from July 23, 2011 to August 2, 2001. Each provider note indicates that Ortega is feeling better with therapy. [AR 198, 201-02.] On July 31, 2001, Dr. Reeve saw Ortega, noting that she was being treated with Tylenol and Vioxx but had not shown much improvement. On August 14, 2001, Ortega was given an epidural. [AR 257.] It is not clear from the administrative record if Ortega had returned to work at this time.

---

[11]"Spondylolisthesis is a condition in which one of the bones of the spine (vertebrae) slips out of place onto the vertebra below it. If it slips too much, the bone might press on a nerve, causing pain. Usually, the bones of the lower back are affected. The word spondylolisthesis comes from the Greek words spondylos, which means "spine" or "vertebra," and listhesis, which means "to slip or slide."" A radiologist determines the degree of slippage upon reviewing spinal X-rays. Slippage is graded I through IV: Grade I — 1 percent to 25 percent slip; Grade II — 26 percent to 50 percent slip; Grade III — 51 percent to 75 percent slip; [and] Grade IV — 76 percent to 100 percent slip.
Generally, Grade I and Grade II slips do not require surgical treatment and are treated medically. Grade III and Grade IV slips might require surgery if persistent, painful, slips are present." http://my.clevelandclinic.org/disorders/back_pain/hic_spondylolisthesis.aspx (1/11/2012)

[12]"L5 radiculopathy is the most common lumbosacral radiculopathy, usually produced by disk herniation between the fourth and fifth lumbar vertebral bodies." http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/neurology/low-back-pain/ (Jan. 11, 2012). "Radiculopathy is not a specific condition, but rather a description of a problem in which one or more nerves are affected and do not work properly (a neuropathy). The emphasis is on the nerve root (Radix = "root"). This can result in pain (radicular pain), weakness, numbness, or difficulty controlling specific muscles." http://en.wikipedia.org/wiki/Radiculopathy (Jan. 11, 2012).

### *2002 Records*

Dr. Reeve saw Ortega twice in 2002 – in August and October. She was given an epidural on the first visit [AR 255] and given Lidoderm patches and in injection of Toradol[13] on the second date. [AR 254.] The epidural was only moderately successful.

### *2003 Records*

Ortega continued to be seen by Dr. Reeve and then Dr. France at the IRC in 2003. Her lower back pain persisted. She was given Toradol injections on five dates in 2003. She also was prescribed Ultram. The Lidoderm patches were ineffective. [AR 245, 246, 250-52.]

On September 2, 2003, Dr. France noted that Ortega earlier had declined surgical intervention for her back pain which he considered "entirely reasonable." The epidural injections provided relief for a few days. Dr. France concluded that Ortega was at maximum medical improvement and her impairment rating due to lumbar spine problems was 8% impairment of the whole person. On exam, Dr. France observed pain and tenderness to Ortega's back with muscle guarding, although the examination was mostly normal. He assigned a "permanent duty restriction" of no lifting over 20 pounds, no pushing or pulling over 20 pounds, and no work requiring repetitive back flexion motions. [AR 248.] He provided a return to work authorization to this effect. [AR 247.]

On October 14, 2003, Ortega called IRC with symptoms of a strain to her upper back. She was advised to seek medical care with her primary care physician if the problem worsened. [AR 245.]

---

[13]"TORADOLORAL (ketorolac tromethamine), a nonsteroidal anti-inflammatory drug (NSAID), is indicated for the short-term (up to 5 days in adults), management of moderately severe acute pain that requires analgesia at the opioid level and only as continuation treatment following IV or IM dosing of ketorolac tromethamine, if necessary." http://www.rxlist.com/toradol-drug.htm (1/11/2012).

### *2004 Records*

Dr. France saw Ortega on March 24, 2004.  Ortega had been taking her medications intermittently.  She requested an injection of Toradol.  She also preferred a prescription of Vioxx over Celebrex. [AR 243.] Ortega requested and received a number of Toradol injections in 2004 for her chronic lower back pain that had worsened.  She complained of some radiation of pain to her lower extremities. [AR 241.] Labwork was done in June 2004 that indicated her glucose levels were elevated. [AR 241.]

On July 12, 2004, Ortega had an MRI of her lumbar spine.  A small bulge was noted at L4-5.  AT L5-S1, there was a prominent disc bulge and anterolisthesis.[14]  The impression was anterolisthesis at L5-S1 with stenosis. [AR 272.] On July 13, 2004, Dr. France found that the lumbar spine radiographs showed grade II spondylolisthesis of L5 on S1. [AR 240.] On July 27, 2004, Dr. France noted that Ortega was "fairly stable" on pain medications.  She was prescribed Glucophage for diabetes control.  Ortega was to have a neurosurgical consultation with Dr. Mario A. Gutierrez in Roswell. [AR 239.]

On August 5, 2004, Dr. Gutierrez examined Ortega at Dr. France's request.  She complained of lower back pain and leg pain from July 2000.  She suffered from more pain in the last few months, when walking and standing.  She was treated conservatively but with little or no improvement.  This note states Ortega was not taking any medications for hypertension or DM due to lack of finances.  The note also states Ortega had been off work for about 18 months, but this is unclear. [AR 206.]  Dr. Gutierrez reviewed the MRI and test results and spent an hour explaining the findings to Ortega.  He offered her either conservative treatment or surgery.  If she had surgery,

---

[14]This is another term for spondylolisthesis.
http://www.spine-health.com/glossary/a/anterolisthesis (1/11/12).

he recommended decompressive laminectomy and decompression of lateral recess and of foramen and possible spinal fusion depending on the problems.  Dr. Gutierrez reviewed all of the risks with Ortega, and this note indicates she wished to proceed with surgery when possible.  Dr. Gutierrez stated that he had no objection to a second surgical opinion. [AR 208, 269.]

On August 23, 2004, Dr. France noted that Ortega was fairly stable and "reluctant to go for surgery as recommended by Dr. Gutierrez."  She received a Toradol injection. [AR 238.] Ortega wanted a second surgical opinion. [AR 237.] Ortega continued to see Dr. France through the end of 2004 and to receive injections of Toradol. [AR 234-36.]

### *2005 Records*

Ortega's work information indicates she started working as a full-time community home care provider at an elderly care facility in January 2005 and that she continued that work until April 2008. [AR 144.]

In February, Ortega requested and received another Toradol injection from Dr. France. [AR 232.]

On February 28, 2005, Ortega obtained a second opinion from Dr. Claude Gelinas in Albuquerque. [AR 210.] Ortega reported intermittent symptoms from her back injury.  If she did a lot of heavy lifting, bending, or twisting, the pain worsened.  Dr. Gelinas reviewed her MRI findings of "grade II non mobile spondylolisthesis at L5-S1 level."  He did not believe that she was "eminently required to have surgery."  If the pain worsened, then surgery would be reasonable.  The notes indicate that Ortega similarly was uncertain if her symptoms warranted surgery.  She was to continue to exercise, stretch and do strengthening exercises.  She was to be "very cautious" with bending, twisting or lifting.  Dr. Gelinas recommended she have x-rays taken every year. [AR 210-11.] In a letter summarizing this evaluation, Dr. Gelinas noted Ortega was taking Celebrex, Flexeril,

11

and occasionally Tylenol with codeine. [AR 229.] The letter stated that Ortega should continue to function with previous work restrictions which should be light duty. [AR 230.]

On March 2, 2005, Dr. France gave Ortega a Toradol injection. She told Dr. France that Dr. Gelinas had stated she was a surgical candidate but that there was no need to rush into it since her grade II spondylolisthesis was a mild grade II. [AR 231.] Ortega requested and received three more Toradol injections in 2005. On October 7, 2005, Dr. France indicated that the current medications maintained her back pain at a reasonable level. [AR 226-28.]

**_2006 Records_**

Ortega continued to work this year. [AR 144.]

She was seen at IRC for a number of appointments but her medical care provider was now Dr. Balkman. Ortega was taking Flexeril and Relefen[15] in February 2006. She obtained a refill of Tylenol #3 with codeine. [AR 224.] Ortega was given Flexeril for spasms in July 2006, and directed to take Tylenol with codeine every six hours for pain as needed. She took Relefen two times a day. [AR 222.] On July 21, 2006, Dr. Balkman gave her trigger point injections and prescribed Percocet for severe pain. [AR 220.]

In July and August 2006, Ortega saw her primary care physician, Dr. Tom Wulf. He noted she had a history of uncontrolled DM and was not compliant with medications. [AR 331, 332.] On September 8, 2006, Dr. Wulf wrote that Ortega currently was taking Glucotrol and Metformin but her sugars were still around 188 and she had gained weight. She was taking Lisinopril for hypertension. On this date, Dr. Wulf observed that Ortega was sitting comfortably, reading a

---

[15] "Nabumetone is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)." http://www.webmd.com/drugs/drug-7004-Relafen+Oral.aspx?drugid=7004&drugname=Relafen+Oral&source=1 (1/11/2012).

magazine.  He noted she did not have good insight over Type II DM and believed she should start

taking Insulin until her sugars were well controlled. [AR 329.]

On October 18, 2006, Ortega saw Dr. Balkman, and complained of pain radiating across her

back that was worse at night.  She also suffered from spasms in both legs.  Percocet was somewhat

helpful.  Dr. Balkman prescribed Relafen and Flexeril as needed and Percocet for severe pain.  She

also gave Ortega a Toradol injection as requested. [AR 218.]  On November 15, 2006, Dr. Balkman

noted that the plan was to give Ortega injections of Toradol every other month. [AR 216.]

### *2007 Records*

According to the work information, Ortega was still employed at the elderly care facility in

2007.  [AR 144.] However, she supposedly also had full time positions for just a few months as a

recreational helper (4/07 to 8/07), and as a direct care employee at a disability/elderly care facility

(5/07 to 8/07), and as a cashier at a craft store (8/07-9/07). [AR 144.][16] Ortega's work information

also indicates she worked part-time as a server at a restaurant from November 2007 to January 2008.

[AR 144.]

Ortega was seen by Dr. Balkman at IRC for a number of appointments in 2007.  On March

1, 2007, Dr. Balkman noted that Ortega's blood glucose was under improved control with her

medications. [AR 299.] But, on March 14, 2007, Dr. Wulf found that her diabetes was uncontrolled

and increased medications. [AR 325-26.]

---

[16]Ortega acknowledges there were inconsistencies in the record as to her work history that the
ALJ did not explain.  For example, her work as a community home care provider from Jan. 2005 to Apr.
2008, would have occurred after the amended onset date. [Doc. 15, p.7, n.1.] Ortega assumed that the ALJ
must have reconciled some of these inconsistencies by finding Ortega's work as a community home care
provider ended in August 2007, consistent with her hearing testimony. [Id.] [*See* AR 27] (Ortega testified
she last worked full-time as of September 1, 2007). [*But see* AR 49] (Ortega testified she was a full-time
community home care provider from Jan. 2005 to Apr. 2008).

Ortega continued to obtain prescriptions for Percocet and epidural injections throughout 2007.  [AR 214, 285, 286, 291, 293, 294, 296, 297, 299.] In July 2007, Ortega received electric stimulation.  [AR 279.] In September 2007, Dr. Balkman recommended Z-Coil shoes and noted that a trial of Z-Coil shoes had made walking "a bit easier." [AR 289.] She recommended that Ortega continue with Z-Coil shoes for improved mobility and decreased use of medications. [AR 290.]

### *2008 Records*

Ortega supposedly was working full time until April 2008, but as stated earlier, there are inconsistencies in the record regarding this date.  She also appears to have worked part time through January 2008 and then again as a part-time cleaner at a dry cleaner from March to April 2008. [AR 144.]

In 2008, Ortega saw Balkman regularly at the IRC and received refills of pain and muscle relaxant medications, including Percocet and Soma. [AR 341, 342, 343 280, 281, 282, 283, 284.] Ortega was still following a conservative pain management program.  She did not use any assistive device. [AR 280, 282, 284.] Soma helped Ortega with sleep and reduced spasms in her legs. [AR 280, 342.] In October 2008, Balkman intended to review a home stretch program for Ortega. [AR 342.]

In June 2008, Ortega filed her applications for SSI and DIB, along with other disability paperwork. [AR 128, 135.] Her first disability report indicates she was limited by back pain from a slipped disc.  The pain interfered with her ability to lift, carry, sit for long periods of time, and stand.  This form states that these conditions first interfered with Ortega's ability to work on May 1, 2008. [AR 143.]

In June, Ortega saw Dr. Wulf for hypertension and diabetes. Ortega's diabetes was uncontrolled and she was to restart medications. Dr. Wulf counseled Ortega on the need for compliance with medications. [AR 321.]

On June 24, 2008, Ortega filled out a function report. She stated she awoke in the morning, showered, cooked breakfast, took medications, washed dishes, washed clothes, took a walk, watered the yard, cooked lunch, took a nap, watched television, read the paper, cooked dinner, took medications and sat and rested every 30-45 minutes because her back or legs hurt. Ortega was able to take care of a daughter but the daughter also helped Ortega. One of her daughters helped care for the younger daughter. [AR 164-65.]

Ortega also reported she was not to lift more than 10 pounds [AR 164], although the Court did not find a doctor's restriction to this effect in the record. Indeed, based on Ortega's hearing testimony that "Dr. French" (most likely, Dr. France at IRC) limited her to 10 pounds [AR 50], it is more likely that she received a 20-pound restriction. In 2003, Dr. France limited Ortega's lifting to no more than 20 pounds. [AR 247.]

Before her injury, Ortega was able to work full time, mow the lawn, do home repairs, lift heavy molds for her ceramics hobby and lift her grandchild. She described having constant pain while she engaged in almost any activity. She fixed simple meals [AR 166], cleaned the house for four hours twice a week, and washed dishes every day. She did laundry for one entire day during the week. She did not like to drive alone because of the side effects of medications that made her drowsy. Driving longer distance triggered her back pain. Her hobbies were reading, watching movies, sewing, doing ceramics, scrapbooking, cooking, and baking. She could only do ceramics with help. She could not sew or scrapbook for long due to pain while sitting. She could not cook or bake long due to pain while standing. She kept in contact with family and friends and attended

15

church once a week. [AR 168.] Her constant back pain affected her ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs.  Her memory and concentration were also affected.  She described herself as having high tolerance to stress and pain.  She did not use assistive devices. [AR 169-70.]

On August 23, 2008, Dr. Nii Tetteh Addy, D.O. performed a consultative examination for the state disability office.  Dr. Addy noted Ortega's complaints of chronic lower back pain with disc disease at L5. Ortega suffered from morning stiffness, weakness in her knees and lower extremities. She had a burning sensation in her feet.  Ortega had prescriptions for Oxycodone, Soma, and an arthritis medication.  She had started to work at a local dry cleaner doing alterations but she had to quit in April 2008 due to pain.  She was able to dress and feed herself.  Ortega could stand for up to 30 minutes and for five hours out of eight.  She could walk 20 minutes, sit 30 minutes, and lift ten pounds.  She could drive a car for 30 minutes and could perform household chores.  She had no recent emergency room visits.

Dr. Addy observed that Ortega could get on and off the examination table and up and out of a chair. [AR 302.] her gait was normal and she used no assistive device for ambulation. [AR 303.] Ortega's range of motion of the lumbar spine was normal.  She was able to lie on her back and roll to her side and lie back.  She also could squat.  Dr. Addy concluded there was no clear evidence to suggest any limitation at this time of this exam. [AR 303.]

In September 2008, Ortega's applications for benefits were denied. [AR 65, 66.] On November 24, 2008, Ortega submitted a request for reconsideration, stating her extreme back pain continued to interfere with her daily living and prevented her from getting a job "since I can only lift 10 pounds per doctor." [AR 78.]   But, there is no corresponding doctor's note in the administrative record as to the 10-pound limitation.

Ortega filled out another Disability Report (Appeal) stating her back was worse and she had trouble getting out of bed.  She suffered from more pain if she walked and she tired quickly.  These changes occurred in October 2008. [AR 175.]

### *2009 Records*

Ortega did not work in 2009.  She saw Balkman for back-related pain on five occasions in 2009. [AR 335, 337, 338, 339, 340.] She also saw Dr. Wulf on several occasions related both to diabetes and ear complaints. [AR 315, 317, 319.]

On March 11, 2009, Dr. Vining completed a Physical RFC Assessment for disability services.  Dr. Vining noted Ortega's diagnoses and found she could occasionally lift 20 pounds, frequently lift 10 pounds, and sit, stand or walk for six hours a day.  Her ability to push or pull was unlimited.  Dr. Vining discussed Dr. Gelinas's report, in which he limited Ortega in stooping, crouching, or twisting.  While the consultative examiner (Dr. Addy) found no limitations, Dr. Vining believed there should be lifting restrictions, based on the MRI. [AR 310.]

On March 31, 2009, Ortega's requests for reconsideration were denied. [AR 67, 68, 85-90.] Ortega filed out another Disability Report (Appeal), stating her back hurt more and that these changes occurred in March 2009. [AR 184.] Because of more severe pain, Ortega could not always get out of bed or walk.   Her medications were: Etodolac, Glipizide, Ketolcyclo, Lidoderm, Lisinopril, Lorastatin, Metformin, Percocet, and Soma.  She was taking medication for high blood pressure and cholesterol. [AR 188.] There were days she could not dress or take showers without help.  She was unable to do much house work and felt she was not the "same person." [AR 184.]

On December 3, 2009, the ALJ conducted a hearing in Roswell, at which Ortega was represented. [AR 22, 24.] She testified about her work efforts and history, and stated that while she injured her back in 2000, she continued to work full time for three or four years. [AR 30.] She was

17

still being seen by her medical care provider during that time and took pain medications at night. Currently, her back hurt "more than ever before," and Ortega still took pain medications. Her only relief from constant pain every day was pain medication. [AR 30-31.]

The ALJ asked Ortega to describe her level of pain on a scale of 1 to 10, with 1 being a "little bit" of pain and 10 being so bad she would immediately go to a doctor or the emergency room. Ortega testified her level of pain was 8-10, almost daily.  The ALJ asked her in an average week (neither her best nor worst week) how often her pain was at a level 10.  She responded that she had that type of pain "at some point every day."  However, she had never gone to an emergency room even as early as the 2000 injury.  Ortega was able to tolerate the pain because she took Oxycodone which helped for several hours.  Ortega testified that her pain right then at the hearing was an 8 or 9.  She had not taken her pain medication because she had to drive to the hearing. [AR 30-33.]

At about this time in the hearing, Ortega stood up because she was uncomfortable. [AR 34.] She testified that she was able to take a shower, clean up the kitchen, and "throw a load of laundry in the wash."  She sat down to rest and had lain down from time to time due to her medications.  She tended to rest an hour or two in the morning.

In response to questions by the ALJ, her attorney confirmed that none of the medical records indicated any muscle atrophy or loss of muscle tone. [AR 35.] Ortega testified that in September 2007, her onset date, she could stand or walk without pain or fatigue for 15-20 minutes; sit for 15-20 minutes; and lift 10 pounds.  As of the current date, she could walk 10 to 20 minutes, stand 10-15 minutes, sit 10-15 minutes, and lift 10 pounds before the onset of pain. [AR 35-37.] Ortega believed she had lost about 10 pounds from September 2007 to the current date because of her diabetic diet. [AR 39.]

18

When asked if she had told her treating physicians that her pain was severe, she said she had. [AR 41.] Ortega also testified that she would love to return to work if her health were better. [AR 45.]

The ALJ provided a number of hypotheticals to the vocational expert. The VE's testimony was that Ortega could perform light level work with restrictions. [AR 52-53.] However, if Ortega was unable to concentrate for two hours, that would affect job retention. [AR 57.] Similarly if Ortega took strong pain medication in the morning and afternoon that took her "off task" for two hours, there were no jobs she could perform. [AR 63.]

### ***2010 Records***

There are no medical records from 2010. The ALJ issued an unfavorable decision on March 25, 2010. [AR 7-18.] Ortega filed a request for review on May 27, 2010, and on September 16, 2010, the Appeals Council denied the request for review. [AR 1-3.]

## V.   DISCUSSION

### A.   Alleged Legal Error

Ortega first challenges the ALJ's credibility determination, asserting four separate arguments. [Doc. 15, p. 9.] Ortega also contends that the ALJ committed error in evaluating the medical opinions of Dr. Gelinas and the non-examining, non-treating state-agency doctor. [Doc. 15, p. 22.]

### B.   Analysis

#### 1.   Credibility and Pain Assessment

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citation omitted). It is well-established in the Tenth Circuit that

19

credibility determinations are the province of the ALJ, and furthermore, that the Court may not re-weigh the record and make its own *de novo* credibility findings.  Hamilton, 961 F.2d at 1499.

> The ALJ enjoys an institutional advantage in making the type of determination at issue here. Not only does an ALJ see far more social security cases than do appellate judges, he or she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. As a result, the ALJ's credibility findings warrant particular deference.

White v. Barnhart, 287 F.3d 903, 910 (10th Cir. 2002).

However, the ALJ's "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988).  An ALJ must articulate specific reasons for questioning a claimant's credibility when subjective pain testimony is critical.  Wilson v. Astrue, 602 F.3d 1136, 1144 (10th Cir. 2010) (internal citations omitted).

In Wilson, the Circuit Court restated the process an ALJ should use in evaluating a claimant's subjective allegations of pain:

> The framework for the proper analysis of Claimant's evidence of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir.1987). We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

Id. at 1144–1145 (internal quotations and citations omitted).  In determining the credibility of a claimant's subjective complaints of pain, the ALJ should consider such evidence as:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other

> witnesses, and the consistency or compatibility of nonmedical
> testimony with objective medical evidence.

Id. at 1145 (internal quotation and citations omitted).

Here, the ALJ determined that while Ortega's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements about intensity, persistence and limiting effects were not credible to the extent they were inconsistent with the ALJ's RFC assessment.  [AR 16.]

The ALJ proceeded to discuss the evidence upon which he relied for the adverse credibility finding, including Ortega's continued work after the onset date of disability, that the continued work "at least at times," indicated her daily activities were "somewhat greater" than Ortega "generally reported," her "wide variety of daily activities," his conclusion that Ortega "probably magnified her symptoms," his finding that "in all probability, a person who felt pain at a level 10 of a 1-10 would have gone to the Emergency Room, his observations of Ortega's demeanor at the hearing, including his determination that Ortega's voice did not reflect a lot of pain, Ortega's failure to report to medical care providers that she suffered side effects from powerful pain medications, and his expectation that Ortega would suffer from muscle tone atrophy if she was lying down 60 to 90 minutes a day and not regularly exercising. [AR 15-16.]

The Court's initial impression is that much of the ALJ's credibility analysis is tentative or speculative, *i.e.,* his use of qualifiers like "at least at times," "somewhat greater," "probably magnified," and "in all probability."  In addition, an ALJ must carefully avoid stepping into the shoes of a physician.  The ALJ substituted his lay opinion for that of a doctor when he speculated that  muscle atrophy should have occurred if Ortega was lying down for an hour or more a day, but not exercising at all.  *See* Hamlin v. Barnhart, 365 F.3d 1208, 1221 (10th Cir. 2004) (ALJ cannot

substitute his own medical opinion for that of a physician).  *See also* <u>McGoffin v. Barnhart</u>, 288 F.3d 1248, 1252 (10th Cir. 2002) (in discussing treating physician assessment, ALJ may not make speculative inferences from medical reports and may not reject physician opinion based on his or her own credibility judgments, speculation or lay opinion); <u>Matthews v. Astrue</u>, 231 F. App'x 804, 807 (10th Cir. May 3, 2007) (unpublished) (implying that an ALJ's credibility analysis that appeared to be boilerplate language and speculation would be improper).

The ALJ's conclusion that Ortega's part-time work activity after the alleged onset date indicates Ortega's daily activities were greater than she generally reported could be interpreted differently, as argued by Plaintiff.  For example, some courts have held that a claimant's persistent attempts to work notwithstanding impairments, support that individual's credibility. *See, e.g.,* <u>Tyson v. Apfel</u>, 107 F.Supp.2d 1267, 1270 (D. Colo. 2000) (claimant's persistent attempts to work with impairments bolstered her credibility); <u>Ward v. Apfel</u>, 65 F.Supp.2d 1208, 1214 (D. Kan. 1999) (consistent work history and numerous attempts to return to work on part-time basis supported claimant's credibility).  *But see* <u>Jesse v. Barnhart</u>, 323 F.Supp.2d 1100, 1106 (D. Kan. 2004) (although a claimant's desire to work should not be used as a negative credibility factor, the ALJ can consider work as a factor in the credibility determination where the claimant actually works, *albeit* not in substantial gainful employment); <u>Willig v. Astrue</u>, 2010 WL 3825396, *8 (N.D. Okla. Sept. 28, 2010) (unpublished) (claimant's continued work as a hairstylist after her alleged onset date indicated she could work), *aff'd* 434 F. App'x 745 (10th Cir. 2011); <u>Steward v. Bowen</u>, 858 F.2d 1295, 1302 (7th Cir.1988) (claimant's ability to perform part-time work has been found to be inconsistent with subjective complaints of pain).

In this case, Ortega worked after the alleged onset date, but each job was short-lived, only lasting a month or two.  Moreover, the evidence appears to show that Ortega worked full-time for

more than seven years after the back injury in 2000 and before she applied for benefits 2008. [AR 144.]  She continued to work while she regularly reported significant and increasing pain to her health care providers.  Under these circumstances, the fact that she had a consistent work history for a period of years and attempted to continue to work weighs in her favor rather than against her credibility.

In addition, while the ALJ properly considered Ortega's daily activities in his credibility analysis, he focused on and emphasized the activities Ortega listed in her June 2008 disability report, rather than the reduced activities she reported in subsequent disability reports. [AR 164-170, 175-178, 184-189.]  Even while discussing the June 2008 disability report, the ALJ omitted portions of that report indicating that Ortega received assistance with housework and with caring for her younger daughter, could not mow the lawn or do home repairs, could not lift her grandchild, cooked very simple meals, and was in "constant pain" while she did any type of personal care. [AR 164-65.]

In later disability reports, which the ALJ did not refer to at all in his credibility analysis, Ortega claimed her back was worse, she had trouble getting out of bed in the morning, she suffered from more pain when she walked, and she could not drive or think clearly due to the pain medications she took. [AR 175.] She also stated she tired very easily and that the pain medication caused her to feel disoriented, dizzy, and drowsy. [AR 178.] While an ALJ need not discuss every record, he may not ignore evidence favorable to the plaintiff.  Owen v. Chater, 913 F.Supp. 1413, 1420 (D.Kan. 1995), nor may the ALJ selectively omit relevant evidence.  Here, the ALJ relied on only portions of one disability report in analyzing credibility.  The Court determines this is improper when that report and others contained evidence more favorable to Ortega.

During the hearing, the ALJ set up a hypothetical rating of pain, where 1 meant "a little bit of pain," and 10 meant "the kind of pain that was so bad all a person could think of was to

immediately see a doctor or go to a hospital." [AR 15.] The ALJ then asked Ortega to rate her pain using that scale. While the pain scale imposed by the ALJ might be clear to some people, it is subjective as to what "a little bit of pain" is to various individuals or what amount of pain might immediately send someone to the hospital. The fact that Ortega rated her pain as a 10 on many days but never went to the hospital or doctor is not necessarily a clear indicator of her lack of credibility as found by the ALJ. This is true because Ortega was taking strong, narcotic pain medications to control her pain – medications that had been routinely prescribed for Ortega for years. Furthermore, lack of finances was a factor in Ortega not taking medications for DM and hypertension. [AR 206.] Given medical treatment costs, Ortega's lack of finances could explain why she did not seek emergency room assistance when pain levels were very high.

In addition, while the ALJ need not discuss every medical record, there is no mention of certain aspects of Ortega's medical treatment, including "the levels of medication and their effectiveness, the extensiveness of [Ortega's] attempts (medical or nonmedical) to obtain relief, [and] the frequency of medical contacts. . . ." *See* Wilson, 602 F.3d at 1144 (listing factors ALJ "should consider"). This discussion is particularly important in a case such as this where Ortega repeatedly and consistently sought medical treatment for years while she continued to work. During 2008 and 2009, Ortega had 13 appointments with Dr. Balkman at IRC. Before she ever applied for benefits (from 2005 to June 2008) Ortega was seen at IRC about 28 times about her chronic back pain. She received a number of different treatments in the attempt to control her pain, including Toradol injections, epidurals, pain patches, medications such as narcotic painkillers and muscle relaxants, physical therapy, electrical stimulation, and trigger point injections. This is not the situation where a claimant applies for benefits and suddenly begins seeing medical providers on a monthly basis for the first time, or where the claimant did try many different treatment options.

In the credibility analysis, the ALJ discussed Ortega's use of narcotic painkillers to help control her pain, only to the extent he identified a November 6, 2009 record, stating that Ortega did not report any side effects from medications, *e.g.,* drowsiness or fatigue. [AR 16.] This is accurate. The November 6, 2009 medical record provides:

> The patient presents today for a follow-up.  The patient has a history of chronic pain and already has been placed at maximum medical improvement.  The patient presents for refills of their [sic] medication.  They [sic] have tolerated the medication well and there are no side effects reported.  The patient will continue in a conservative pain management program and follow-up in our clinic . . . .

[AR 337.]  The problem with emphasizing this single medical record is that the medical records from July 7, 2009, May 8, 2009, March 6, 2009, January 12, 2009, November 12, 2008, October 13, 2008, June 13, 2008, May 12, 2008, April 11, 2008, February 28, 2008, January 25, 2008, December 21, 2007, November 26, 2007, October 26, 2007, September 27, 2007, July 26, 2007, May 9, 2007, and April 3, 2007, all say the same thing, word-for-word.  Thus, the boilerplate nature of this paragraph calls into question whether the medical provider actually discussed side effects of medications with Ortega.

For all of the above-stated reasons, the Court concludes that notwithstanding the ALJ's central role in assessing credibility, substantial evidence does not support the credibility findings. Thus, the Court recommends remanding this case for an additional administrative proceedings so that the ALJ can reassess credibility and the RFC determination, as it relates to credibility.

Because of the remand, the Court does not reach Ortega's additional argument concerning how the ALJ weighed the opinions of the treating and non-treating physicians.  On remand, the ALJ should carefully follow the required regulations in weighing opinions of the various physicians.  In addition, the ALJ may elect to order a new consultative examination based on the date of previous examinations.  Upon rehearing, the ALJ should clarify the dates of Ortega's employment because

of inconsistencies or discrepancies in the administrative record and her testimony.  The parties

should also attempt to obtain and include an earnings record as part of the administrative record.

**VI.**   **RECOMMENDED DISPOSITION**

That Plaintiff Ortega's motion to remand be granted and that this matter be remanded for

additional administrative proceedings in accordance with this opinion.

_Lorenzo F. Garcia_
_____
Lorenzo F. Garcia
United States Magistrate Judge